**Robert J. PROKOP, M.D., Plaintiff,**

v.

**UNITED STATES of America, acting By and Through the UNITED STATES DEPARTMENT OF AGRICULTURE and Farm Service Agency, Defendants.**

No. 4:97CV3395.

United States District Court,
D. Nebraska.

March 29, 2000.

Robert J. Prokop, M.D., Wilber, NE, plaintiff pro se.

Sally R. Johnson, Assistant United States Attorney, Lincoln, NE, for defendant.

## MEMORANDUM AND ORDER

KOPF, District Judge.

This is an action for judicial review of a final agency determination of the National Appeals Division (NAD) of the United States Department of Agriculture (USDA) concerning the classification of certain farm property owned by Plaintiff as "farmed wetland pasture." By previous order of this court (filing 77), this action is being resolved as if cross-motions for summary judgment had been filed.[1]

### I. BACKGROUND

Plaintiff Robert Prokop owns farm land located in Nance County, Nebraska, which is known as Farm No. 1347, tract 820, in the Records of the Nance County Committee of the Farm Service Agency (Administrative Record at 7.)[2] Plaintiff has participated in farm programs conducted by the

---

1. The parties were directed to submit proposed findings of fact indexed to the record and conclusions of law. Plaintiff, who appears pro se, did not. He instead submitted a "Pre–Trial Brief." Defendant submitted proposed findings of fact and conclusions of law together with a brief. In response, Plaintiff submitted another brief. Plaintiff's submissions do not focus on the key issue: Was the final agency decision arbitrary, capricious, or an abuse of discretion? This court has parsed through Plaintiff's submissions to ascertain why Plaintiff believes the final agency action should be overturned on review. This memorandum and order addresses only those arguments of Plaintiff which merit discussion.

2. Subsequent references to the Administrative Record will be cited as "AR." The record before the court also includes a transcript of

the hearing before the NAD, cited as "TR.," and a transcript of a prehearing telephone conference call held May 20, 1997, cited as "Prehearing TR." The Administrative Record and transcripts are part of Filing 28. The Administrative Record contains copies of the original exhibits from the NAD hearing. The original exhibits were filed with this court in filing 46, as the original maps and photographs used at the hearing are clearer than the copies in the Administrative Record. Plaintiff's assertion that the photographs and maps used as exhibits at the NAD hearing are invalid or inadmissible because global positioning technology was not used to produce them is without merit. The exhibits and maps are clear enough to support the agency's final determination. They do not have to be perfect.

USDA in connection with his operation of Farm No. 1347 (AR. at 236). By letter dated August 6, 1995, Plaintiff informed the USDA Agricultural Stabilization and Conservation Service (now known as the Farm Service Agency),[3] of his intention to clean out a canal located on property abutting Farm No. 1347 in order to improve drainage in certain areas of farm No. 1347 (AR. at 145). This was a cautionary step to protect Plaintiff's continued eligibility for USDA farm program benefits. *See, e.g.* 7 C.F.R. §§. 12.7, 12.4(h). The Food Security Act, 16 U.S.C. §§ 3821–3824, (commonly known as Swampbuster) and its implementing regulations provide that farmers who "convert" a wetland after December 23, 1985, through manipulations which affect wetlands in a prohibited manner, forfeit their eligibility to receive USDA program payments and loans. *See, e.g.,* 7 C.F.R. § 12.4. Generally, continued maintenance of a manipulation affecting a wetland is allowed to the extent that the manipulation existed prior to the effective date of the act. 7 C.F.R § 623.2.

Upon receipt of Plaintiff's August 6, 1995 letter, the USDA made a determination as to whether cleaning out the canal would affect wetlands in a manner which would violate Swampbuster and thereby affect Plaintiff's eligibility to participate in USDA farm programs. By November 7, 1995 letter from William Gilg, Resource Conservationist in the Fullerton Field Office of the NRCS, the USDA notified Plaintiff that two areas located on Farm No. 1347, consisting of a total of eight acres,[4] were considered "farmed wetland" subject to Swampbuster restrictions, but that Plaintiff was free to clean out the canal because the proposed action was considered allowable maintenance which would not affect his eligibility for USDA farm programs (AR. at 136–38). The letter advised Plaintiff that he could request a reconsideration by making a request to the NRCS within 15 days.

By letter dated November 8, 1995, Plaintiff objected to the farmed wetland classification, asserting that he sought not a reconsideration but a ruling that the land

**3.** Many of the documents in the administrative record use only acronyms or abbreviations for the many agencies and statutes involved in this determination. For clarity, I identify all of the acronyms and abbreviations in this footnote.

| | |
|---|---|
| ASCS | The United States Department of Agriculture Agricultural Stabilization and Conservation Service, a predecessor agency to the Farm Service Agency |
| FSA | The Farm Service Agency, successor to the United States Department of Agriculture Agricultural Stabilization and Conservation Service |
| COC | See Nance County Committee |
| NAD | The National Appeals Division of the United States Department of Agriculture |
| Nance County Committee | The Nance County Committee of the Farm Service Agency, referred to in some documents as COC, or Nance County CFSA (Consolidated Farm Service Agency)—e.g. AR. at 149 |
| NRCS | The United States Department of Agriculture Natural Resources Conservation Service, successor agency to the Soil Conservation Service |
| SCS | The Soil Conservation Service, a predecessor agency to the Natural Resources Conservation Service |
| Swampbuster | The Food Security Act, 16 U.S.C. §§ 3821–3824 |
| USDA | United States Department of Agriculture |

**4.** Various parts of the Administrative Record, including the Wetland Inventory Map (AR. at 197 and filing 46) and the field visit reports (AR. at 221–27) refer to "Site A" and "Site B." Site A consists of 3.1 acres in the southeast corner of Farm No. 1347. Site B consists of 4.9 acres located in an area on the east side of Farm No. 1347, roughly halfway between the north and south boundaries of the farm. The Administrative Record contains documents which specifically define the areas in question as three parcels of land in Farm No. 1347, Tract 820, Fields 1, 2, and 3. (*See, e.g.,* AR. at 4, 7, 183.) The parcel referred to as Site A consists of 3.1 acres located in Field 3. The two parcels collectively referred to as Site B including contiguous parts of Field 1 and Field 2 consisting of a total of 4.9 acres. (*See, e.g.,* AR. at 197, 221–27) For simplicity, I will refer to Site A and Site B.

was wetland followed by appropriate notice to Plaintiff and an opportunity for Plaintiff to appeal the wetland ruling (AR. at 206).[5] Plaintiff's November 8, 1995 letter was treated as a request for reconsideration. Two NRCS employees (Al Mittan and James Huntwork) met with Plaintiff and conducted an on-site investigation on December 1, 1995 (AR. at 201). This was the first of two field visits that were made to Plaintiff's farm during the review process. Upon reconsideration, the Ord field office of the NRCS notified Plaintiff on January 23, 1996 of the agency's determination that Sites A and B would be classified as "farmed wetland pasture" rather than "farmed wetland" (AR. at 201). This was the first of five agency reviews of the wetland determination.

Plaintiff appealed the determination that the two identified areas in Farm No. 1347 were farmed wetland pasture by a February 18, 1996 letter to Stephen H. Chick, the State Conservationist of the NRCS (AR. at 199). In response to this appeal, on May 1, 1996, NRCS employees Gerald Jasmer, Lyle Rasmusen, and Richard Torpin conducted a field visit to the land in question (AR. at 192). This was the second field visit to the site. By letter dated May 30, 1996, the State Conservationist of the NRCS made a final technical determination that the land in question was "farmed wetland pasture" (AR. at 128–29). This was the second agency review of the wetland determination.

Next, Plaintiff appealed the decision of the NRCS State Conservationist to the FSA Nance County Committee (AR. at 191). After conducting a hearing on Plaintiff's appeal, the FSA Nance County Committee upheld the classification as farmed wetland pasture (AR. at 104–111). This was the third agency review of the wetland determination. At the hearing, the Nance County Committee was advised that its review was limited to determining whether there was an error in the State Conservationist's determination (AR. at 108) and found no error in that determination (AR. at 104). Plaintiff was advised of these findings by April 10, 1997 letter signed by Bruce Coffey, the executive director of the FSA Nance County Office (AR. at 104–06).

On April 22, 1997, Plaintiff appealed the FSA Nance County Committee's decision to the USDA's National Appeals Division (NAD) (AR. at 375). A prehearing conference was held by Hearing Officer Paul Handley of NAD on May 20, 1997 (Prehearing T. at ii). Based on the understanding that the hearing would be held June 23, 1997 (*see* AR. at 337), on May 27, 1997, Plaintiff waived the requirement that the hearing be held within 45 days of April 22, 1997 (the date he filed his administrative appeal) (AR. at 363). The hearing was scheduled for June 23, 1997 (AR. at 351–54), and was postponed because of a dispute over whether all witnesses Plaintiff sought to call at the hearing would be made available in light of Plaintiff's refusal to submit a summary of the testimony he sought from these witnesses (AR. at 339–40). On June 24, 1997, upon notice that the June 23 hearing date had been postponed, Plaintiff sent a letter withdrawing his previous waiver and demanding that

5. This is one indication of Plaintiff's misunderstanding of the process set in motion by his request to clean out the canal. He did not acknowledge that the November 7 letter constituted a notice of a determination that the land in question was "wetland" and was wetland subject to Swampbuster restrictions (at this point, the agency took the position that the land was "farmed wetland"), nor that the "reconsideration" referred to in the November 7 letter was the opportunity to appeal the determination that the land in question was wetland subject to Swampbuster restrictions.

This misunderstanding is compounded in two ways: Plaintiff denies the validity of the process by which land is determined to be wetland subject to Swampbuster restrictions and Plaintiff considers the term "wetland" to be synonymous with the legal conclusion that the land is "wetland subject to Swampbuster restrictions." These misunderstandings are addressed *infra* under the "Substantive Due Process" heading.

the hearing be held not later than July 7, 1997 (AR. at 337). The NAD received this letter on June 25, 1997. On June 26, 1997, in response to Plaintiff's demand, NAD scheduled the hearing for July 1, 1997 (AR. at 332) and reassigned the hearing to Hearing Officer Jack Richardson (AR. at 331), as Hearing Officer Handley's schedule would not permit him to conduct the hearing by July 7 (AR. at 7).

At the July 1, 1997 hearing, the Hearing Officer gave both parties additional time to supplement the record. They did so. After the hearing and the supplementation of the hearing record by the parties, on July 22, 1997, Hearing Officer Richardson issued a written opinion upholding the classification of the two areas in dispute as "farmed wetland pasture" (AR. at 30–36). This was the fourth agency review of the wetland determination. Plaintiff requested review of this decision by the Director of NAD. On September 22, 1997, the NAD Director issued his "Director Review Determination" which upheld the classification as "farmed wetland pasture" (AR.4–6). The NAD Director's determination is the final administrative decision in this matter (and the fifth agency review of the wetland determination). Plaintiff then filed this appeal of the final agency determination upholding the "farmed wetland pasture" determination.

The Swampbuster statutes and regulations were amended in 1996,[6] and the 1996 amendments laws applied to the agency action regarding Plaintiff's property. The interim proposed regulations, which were ultimately those adopted, were those used by the agency. *See* AR. at 41–90, TR. at 16–17.

## II. DISCUSSION

### A. STANDARD OF REVIEW

■ The agency's factual finding that certain farm property owned by Plaintiff is farmed wetland pasture is a classic example of a factual dispute implicating substantial agency expertise. *Downer v. United States,* 97 F.3d 999, 1002 (8th Cir. 1996) (questions regarding agency determinations that farmer's land was converted wetland rather than artificial wetland and that wetland conversion did not commence prior to effective date of Swampbuster were "classic examples of factual disputes implicating substantial agency expertise.") Accordingly, review is limited to a determination of whether the NAD Director's determination upholding the classification of the sites in question as "farmed wetland pasture" was " 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " *Id.* (quoting 5 U.S.C. § 706(2)(A)). The narrow review includes a de novo review of the administrative record "to determine 'whether the decision was based on a consideration of relevant factors and whether there has been a clear error of judgment.' " *Id.* (quoting *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)). The nature of this review is clear:

> To perform this review the court looks to whether the agency considered those factors Congress intended it to consider; whether the agency failed entirely to consider an important aspect of the problem; whether the agency decision runs counter to the evidence before it, or whether there is such a lack of a rational

---

**6.** One of the proposed 1996 amendments to Swampbuster would have provided an exception for wetlands under one acre. This proposal was never enacted into law. *See* Daryn McBeth, *Wetlands Conservation and Federal Regulation: Analysis of the Food Security Act's "Swampbuster" Provisions as Amended by the Federal Agriculture Improvement and Reform Act of 1996,* 21 Harv.Envt'l.L.Rev. 201, 241 n. 256, 250–53 (1997). At various

stages during the determination and review process affecting Plaintiff, Plaintiff asserted that there was an "under one acre" exception applicable to the wetlands on Sites A and B. Agency employees sought this exception in the statutes, but understandably did not find it since the proposal did not become law. Plaintiff's continued belief in this nonexistent exception likely contributed to mistrust of the agency and continued confusion by Plaintiff.

connection between the facts found and the decision made that the disputed decision cannot "be ascribed to a difference in view or in the product of agency expertise." *Motor Vehicle Mfg'rs, Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). If the agency itself has not provided a reasoned basis for its action, the court may not supply one. *Id.*

Nonetheless, the reviewing court may not substitute its judgment for that of the agency and must give substantial deference to agency determinations. *Id.* This deference is particularly appropriate when the agency's determination in issue concerns a subject within the agency's own area of expertise. *Marsh*, 490 U.S. at 377–78, 109 S.Ct. 1851. An agency making fact-based determinations in its own field of expertise, particularly where those determinations are wrapped up with scientific judgments, must be permitted "to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Id.* at 378, 109 S.Ct. 1851. *Downer*, 97 F.3d at 1002.

## B. SUBSTANTIVE DUE PROCESS

### 1. Agency Determination of "Farmed Wetland Pasture"

■ At the NAD hearing, both parties agreed that Site A and Site B were wetlands. They disagreed as to whether they were wetlands subject to Swampbuster restrictions. Plaintiff asserted that Site A should be considered an "artificial wetland" because it resulted from the activities of beavers in the canal on the east side of Plaintiff's property, and Site B should be considered an "artificial wetland" because it was created by irrigation runoff after he began irrigating the farm in the 1970's. (TR. at 24–25, 33.) "Artificial wetlands" are not subject to Swampbuster restrictions. The agency asserted that the sites were "farmed wetland pasture" (and farmed wetland pasture is subject to

Swampbuster restrictions). The final agency determination is that the sites are farmed wetland pasture.

The regulations define "farmed wetland pasture" as

wetland that was manipulated and managed for pasture or hayland prior to December 23, 1985, and on December 23, 1985, met the following hydrologic criteria:

(i) Inundated or ponded for 7 or more consecutive days during the growing season in most years (50 percent chance or more), or

(ii) Saturated for 14 or more consecutive days during the growing season in most years (50 percent chance or more)

7 C.F.R. § 12.2(a). Thus, to be "farmed wetland pasture," land must (1) be wetland, (2) have been manipulated and managed for pasture or hayland prior to the effective date of Swampbuster, and (3) on the effective date of Swampbuster (December 23, 1985) have met specified hydrologic criteria. There is substantial evidence in the record to support the final agency determination that Sites A and B are "farmed wetland pasture."

Plaintiff stipulated that the land was "wetland" at the administrative hearing (TR. at 22–24, 32–33). In addition, the on-site inspection data (AR. at 173, 221–27, 232, 257–58) supports the wetland finding, as do the photos, soil maps, soil surveys, and soil lists in the record (AR. at 209–20). Site A has always been a natural drainage way which carried precipitation and snow melt from land south of Plaintiff's property across the corner of Plaintiff's farm onto land directly east of Farm No. 1347, and into the Loup River, which runs from west to east north of Farm No. 1347. (AR. at 267, 269, 276.) Soil mapping commenced in 1955 and a 1960 soil survey indicate that the soil on Site A and Site B is hydric (AR. at 209, 215). The NAD hearing included credible testimony from NRCS employees with personal knowledge that both Site A and Site B are naturally occurring wetlands which existed well before drainage

on either site was manipulated by human activity (TR. At 90–105). Plaintiff acknowledged at the NAD hearing that both sites were wet in times of precipitation (TR. at 33–36, 72). Plaintiff presented affidavits from his witnesses which stated that, prior to 1985, water flowed through Site A when it rained or during snowmelt (AR. at 267, 269), and that the property had always been difficult to farm due to wetness (AR. at 276). Thus the first part of the definition of "farmed wetland pasture" is met.

■ There is no question that Sites A and B had been manipulated prior to December 23, 1985 (the effective date of Swampbuster) through the construction of the canal and the 1972 land leveling activities described in the record. Whether or not livestock actually graze in a pasture is not determinative of whether land should be considered pasture for Swampbuster purposes. Plaintiff himself referred to the land in question as pasture in a letter to Farm Service Agency dated February 25, 1983 (AR at 243). Neither site had been cropped for over five years except for a small stand of alfalfa (a form of hay) (AR at 236–42).[7] The property was fenced, an indication of pasture. The NRCS officials reasonably concluded that the property was pasture based on Plaintiff's use of the property and their visual inspection. This satisfies the second part of the definition: The land was pasture manipulated prior to the effective date of Swampbuster.

To be "farmed wetland pasture," Sites A and B must have met specified hydrologic criteria on December 23, 1985. On that date, the sites must have been either inundated or ponded for 7 or more consecutive days during the growing season in most years or saturated for 14 or more consecutive days during the growing season in most years. The agency established that these hydrologic criteria were met. The agency relied upon a soil map of an area including Plaintiff's land which was completed as a part of a soil mapping project begun in 1955 (the mapping was completed by the SCS, the predecessor agency to the NRCS). (AR. at 209 (and filing 46), TR. at 92.) The agency also relied upon a 1960 soil survey (AR. at 210–20). Both the 1955 soil map and 1960 soil survey indicate that Sites A and B met the hydrologic criteria. The soil on Site A was classified as "Cs" (Cass Fine Sandy Loam), which is a classification for soils with a water table of 0–1 foot and having hydric soils present which meet saturation criteria (AR.209, 215). The soil on Site B was classified as soil type "Le" (Leshara Silt Loam), which is also a classification for soils with a water table of 0–1 foot and having hydric soils present which meet saturation criteria. *Id.* Maps created on the basis of soil surveys showed an intermittent stream in the areas making up both sites (TR. at 209 (and filing 46)). The soil maps, soil surveys, soil lists, aerial photography and on-site inspection data indicated the presence of hydric soils which meet the saturation requirement. The agency's reliance on the soil maps and surveys to identify hydric soils is authorized by the regulations. 7 C.F.R. § 12.31. The technical data the agency relied upon to establish the third part of the "farmed wetland pasture" definition is within an area of substantial agency expertise, and the agency's determination is entitled to substantial deference. *Downer*, 97 F.3d at 1002.

To refute the substantial evidence submitted by the agency, Plaintiff provided only his own observations and the observations of others which did not speak directly to the question of whether the agency's classification of the land as

---

7. Plaintiff's briefs assert that the land was not cropped because he had been told to use this as set-aside land, and that he was unable to prove this because he was prevented from presenting live testimony of witnesses. As explained later in this opinion, Plaintiff was prevented from presenting live testimony because he refused to comply with applicable procedural rules, and could have supplemented the record with evidence as to why the land had not been cropped, but chose not to.

farmed wetland pasture was proper. Plaintiff has the burden of proving that the agency decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See Downer*, 97 F.3d 999; 7 U.S.C. § 6997(c)(4) ("The appellant shall have the burden of proving that the adverse decision of the agency was erroneous."). He did not meet it. The administrative record, as a whole, contains substantial evidence to support the agency's determination, and, as in *Downer*, there is

> no evidence that the agency considered any factors Congress did not intend it to consider in making its determination, nor is there any indication that the agency failed to consider an important aspect of the wetlands determination problem. The agency's technical determination is squarely within its field of expertise and was made in reliance on its own qualified experts' examination of the sites and other relevant data. The decision was rational and does not run counter to the evidence.... Thus, the dispute is within the realm of agency expertise, and not the result of arbitrary and capricious decision-making.

*Id.* at 1003–04.

In making its determination, the NAD observed that "FSA acknowledges the area has peculiarities which exist concerning the development of the wetlands [referring to improper maintenance of the canal on property adjacent to Plaintiff's property and the beaver activity]," and made this statement: "[I]f drainages are cleaned out and the areas became drier, a request for a new determination could be made." (AR. at 7.) This is a clear indication that the agency did not fail to consider any important aspect of the wetlands determination on Sites A and B.

### 2. Artificial Wetland

Plaintiff contends that the sites in question are artificial wetland, asserting that

his neighbor's construction of a canal in 1985 near Site A, resulting in beaver dam problems, and the 1972 field grading performed near Site B, created the wetland. Artificial wetlands may be manipulated without creating a conversion affecting eligibility for farm program funds. 7 C.F.R. 12.5. However, the regulations define "artificial wetland" as "an area that *was formerly non-wetland*, but now meets wetland criteria due to human activities...." 7 C.F.R. § 12.2(a) (emphasis added). The 1960 soil survey showed the existence of hydric soils in both of the disputed areas and an intermittent stream in both areas. Evidence submitted by Plaintiff from a person who has custom farmed Plaintiff's Nance County farm for 20 years indicates that the area was always wet and difficult to farm, though it became wetter and harder to farm after the canal was constructed in 1985. See text accompanying note 13, *infra*. Although the beavers and the canal made the area wetter, evidence in the record (fact that Site A was a natural drainage way, hydric soils and the intermittent stream) indicates that the area was "wetland" before the beavers and the canal.[8]

Plaintiff seeks to prove that the wetlands are "artificial wetland" and thus exempt from Swampbuster restrictions. He has the burden of proving that the artificial wetland exemption applies. *Downer*, 97 F.3d at 1005 (Farmer who asserted that he had not converted wetlands in a manner that violated Swampbuster because the land was "artificial wetland" had the burden of proving the land was "artificial wetland.") (citing 7 C.F.R. § 12.5(b)(9), now codified at 7 C.F.R. § 12.5(b)(7)) ("The burden rests with [Plaintiff] not only to establish facts warranting the exemption before the agency, but also to demonstrate to this court where in the record such facts may be found." *Id.*) Plaintiff asserts that the agency finding that the land had always been wetland is wrong based upon

---

8. In addition, the NRCS manuals interpreting the controlling regulations specifically state that beaver activity cannot create an artificial wetland (AR. at 259–60).

his own observations and affidavits of his neighbors, none of which directly address the question of whether the land was wetland prior to the effective date of Swampbuster. Plaintiff has not carried his burden of proof that the wetland is "artificial wetland."

If the agency had the burden of proving that the two sites were not "artificial wetland" (which it does not), the agency had met the burden. The technical data relied upon by the agency in determining that the land was "farmed wetland pasture" in fact establishes that the land in question was "wetland" prior to the canal, beaver activity and leveling. In *Downer,* one judge dissented from the majority's finding that the farmer had the burden of proving that the land was "artificial wetland," finding that the agency had the burden of proving that the land was *not* artificial wetland. In noting that there was no evidence in *Downer* that the agency had made any findings as to whether the wetland was an artificial wetland, this dissenting judge pointed out the type of evidence that could have supported an expert determination that the wetlands were not artificial (if it had been in the record)—evidence as to soil type or aerial photographs. *Downer,* 97 F.3d at 1009 (Beam, J., dissenting). Though the *Downer* record lacked this technical data upon which agency experts could have made findings regarding artificial wetland, the record before me regarding the wetlands determination on Plaintiff's land clearly includes the appropriate technical data to support the agency's determination.

## C. DUE PROCESS

### 1. Notice

#### Of NAD Hearing

■ By letter dated June 24, 1997, Plaintiff demanded that the hearing before

the NAD be held not later than July 7, 1997. The NAD received this letter on June 25, and responded to it on June 26 by rescheduling the hearing to July 1, 1997. Plaintiff got what he asked for—a quick hearing.[9] There were only 12 calendar days between the NAD's receipt of Plaintiff's demand (June 25) and the date by which Plaintiff demanded the hearing take place (July 7). Of these 12 days, four days were weekends and one week day was the Fourth of July holiday. The NAD made a reasonable response to Plaintiff's withdrawal of his earlier waiver and his eleventh-hour demand that a hearing be held no later than July 7. Since Plaintiff requested a hearing that could not possibly have been preceded by 14 days notice even if the NAD had instantly rescheduled it, and the NAD rescheduled the hearing in response to Plaintiff's demand, Plaintiff cannot now complain that he received inadequate notice of the hearing.

### That Wetland Determination Had Been Made

■ Plaintiff's response brief asserts that "[t]he Farm Service Agency never gave the Appellant notification as required by statute, that his farm contained wetland. A determination was made in 1987 from aerial photographs and sent out in some counties but never in Nance County. The notification given was done by forcing the Appellant to request that opinion." (P.'s Sept. 14, 1999 Br. (Rev.Copy) at 8.) Nonetheless, Plaintiff did request a wetland determination for Farm No. 1347, Tract 820, on Form NRCS–CPA–38 "Request for Certified Wetland Determination/Delineation" (AR. at 186.) The form stated that the reason for the request for

---

9. Plaintiff objected to the July 1 hearing date, asserting that he had a previous commitment on that date and was available for a hearing only on July 3 or July 7. (AR. at 319.) Yet Plaintiff did appear at the July 1 hearing and has made no showing that he was prejudiced by the short notice of the hearing date. At the

hearing, Plaintiff was asked if he felt he had been able to present the information he needed to give to the hearing officer, and Plaintiff stated that he thought the hearing officer had been very fair and had done a good job in handling the hearing. (TR. at 140, 147.)

determination was Plaintiff's intention to perform drainage maintenance on land that had been leveled in 1972 and 1978. A wetland determination was made in response to the request, and Plaintiff was notified of this determination by November 7, 1995 letter from William Gilg, Resource Conservationist in the Fullerton Field Office of the NRCS (AR. at 136–38.) This letter began the long chain of reconsiderations and appeals resulting in the final agency decision now before the court. Plaintiff has cited no authority for the proposition that a wetland notification was required prior to his request for the determination. Due process requires notice before adverse action is taken, so that affected persons have an opportunity to be heard before the action is taken. Plaintiff had prior notice and several opportunities to be heard. Plaintiff has not established a due process violation in connection with the wetlands notification.[10]

### 2. Exclusion of Witnesses

■ Plaintiff asserts that he was unreasonably prevented from presenting witnesses at the NAD hearing in a manner that violated due process. This contention is without merit. The NAD hearing was held pursuant to the regulations establishing rules of procedure for NAD hearings (7 C.F.R. part 11). There is no prehearing discovery, though the Hearing Officer establishes a reasonable deadline by which the appellant and the agency must submit specified documents. Both the appellant

and the agency are required to submit "[a] list of anticipated witnesses and brief descriptions of the evidence such witnesses will offer." 7 C.F.R. § 11.8(c)(2). The regulation governing conduct of the hearing provides that "[t]he Hearing Officer may confine the presentation of facts and evidence to pertinent matters and exclude irrelevant, immaterial, or unduly repetitious evidence, information, or questions," and that "[w]hen appropriate, agency witnesses requested by the appellant will be made available at the hearing." *Id.* § 11.8(c)(5)(ii). Plaintiff refused to comply with these provisions after being notified of them several times. As a consequence, Plaintiff was not permitted to call witnesses to present live testimony before the NAD Hearing Officer, though he was permitted to supplement the record of the NAD hearing with notarized written statements of several people he had proposed to call as witnesses.

During a May 20, 1997 prehearing telephone conference, there was an extensive discussion of witnesses to be called by the parties. Plaintiff identified only four potential witnesses, all current or former agency employees (Willits, Lassek, Barnes and Gilg). The discussion of identification of potential witnesses took place in the context of the need for the agency to determine whether it objected to the particular agency witnesses Plaintiff sought to call (Prehearing T. at 7, 16–28, 31). There was no specific discussion of the need to

---

**10.** Plaintiff may be confused by a 1990 change regarding wetlands determinations. Prior to 1990, the USDA's policy was to undertake a wetland inventory and notify the affected producers of the wetlands. In Nance County, the inventory was completed, and was transferred to the ASCS's maps. Before notification to producers of the wetlands determinations had gone out, 1990 amendments to Swampbuster were enacted, and the agency was advised not to send any notices of agency-initiated wetlands determinations to producers. (TR at 136:7–24.) After the amendments, rather than initiating a blanket inventory of all farm property in a county to determine the presence of wetlands, the NRCS now makes a determination as to

whether wetlands subject to Swampbuster restrictions are present only upon written request of the producer. (*See* AR. at 97, 99 (extracts from 1996 and 1995 National Resources Conservation Service, USDA, National Food Security Act Manuals).) Plaintiff may be arguing that any determination by the NRCS prior to 1990 as to whether wetlands were present on Sites A and B is invalid because he did not receive notice or an opportunity to appeal. This ignores the fact that the agency-initiated process of determining whether wetlands were present on Plaintiff's land was not completed prior to 1990, and no adverse action was taken with respect to any such partially-completed, agency-initiated determination.

summarize the testimony of proposed witnesses, and if the only notice to Plaintiff regarding required disclosure in connection with witnesses he sought to call had been the prehearing telephone conference, Plaintiff might have a valid due process claim. However, Plaintiff received several later notices of the required prehearing disclosure regarding proposed witnesses.

The notice of hearing mailed May 21, 1997 specifically directed plaintiff to provide a summary of the witnesses he wished to call (AR. at 351–354) This is the first clear notice to Plaintiff of the witness restrictions. In response, Plaintiff submitted a letter dated May 22, 1997 listing eight current or former agency employees he sought to call as witnesses and nine other proposed witnesses (AR. at 350). There was no summary of the expected testimony of these seventeen proposed witnesses.

Plaintiff's May 22 letter was sent to Mark Bowen, the State Executive Director of the FSA, who notified Plaintiff by June 4, 1997 letter that the agency did not think seventeen witnesses were necessary, and noted that at the prehearing conference Plaintiff had identified a total of four potential witnesses (AR. at 349).[11] This letter from Bowen noted that the State NRCS office had identified four agency employees who would be witnesses for the agency (Rasmussen, Jasmer, Gilg and Huntwork) and that the agency would not object if the agency's witnesses also testified for Plaintiff.[12] Bowen's letter also contained the statement that any witnesses called, whether or not agency employees, would have to have knowledge of information that was not available from other sources. This is the second clear notice to Plaintiff of the witness restrictions.

Plaintiff sent a letter dated June 7, 1997 to Hearing Officer Handley asking Handly to "please indicate to me what you wish for documentation" (AR. at 347), despite the fact that he had been clearly directed, at least twice, to submit a summary of the expected testimony of his proposed witnesses. Hearing Officer Handley responded to Plaintiff's query by June 13, 1997 letter (AR. at 345–46). Handley's letter advised Plaintiff to review the Notice of Hearing, as it listed the required documentation (and the Notice of Hearing clearly called for a summary of the testimony of proposed witnesses). Handley's letter also made it clear that Plaintiff could not call any person as a witness unless that proposed witness possessed information that was pertinent and necessary, and could not be obtained except through the testimony of the proposed witness. The letter also stated that the Hearing Officer could exclude from the record evidence that was irrelevant, immaterial, or unduly repetitious. This was the third clear notice to Plaintiff of the witness restrictions.

On June 14 and 15, Plaintiff sent letters to Bowen and Handley flatly stating that he would not change his witness list or summarize the expected testimony of his proposed witnesses (AR. at 343, 342). In a June 18 letter to Hearing Officer Handley Plaintiff stated that if all agency witnesses he had previously requested were not present at the hearing (then scheduled to be June 23, 1997) he would request that the hearing be recessed (AR. at 341).

Ann Gilbert, the Acting Assistant Director of NAD, then sent Plaintiff a letter dated June 18, 1997—the fourth clear notice to Plaintiff of the witness restrictions (AR. at 339–40). Gilbert's letter recited that Plaintiff had been provided a copy of

---

**11.** This is significant because the Hearing Officer who conducted the prehearing conference would not have been too concerned about hearing repetitive testimony if Plaintiff called only four witnesses. There is a much greater likelihood that the testimony of proposed witnesses would be repetitive if there are seventeen witness than four witnesses.

**12.** Three of the agency employees listed by the agency as witnesses for the agency were also identified by Plaintiff as potential witnesses for Plaintiff (Rasmussen, Jasmer, and Gilg) in Plaintiff's May 22 letter.

the NAD regulations and summarized the regulations regarding witnesses, particularly 7 C.F.R. § 11.8(c)(2) and 11.8(c)(5). The letter explained that the Hearing Officer could not determine whether witnesses should be required to appear without a brief description of the evidence Plaintiff's proposed witnesses would offer, and that the hearing then scheduled for June 23, 1997 was postponed "until the witness information is provided to the Hearing Officer." (*Id.*)

Plaintiff responded with a letter to Gilbert and Handley, again refusing to specify the expected testimony of proposed witnesses, making the blanket statement that "all witnesses have been involved with or have knowledge of the area in question which is the basis of this hearing through either private or governmental contact," and asserting that the witnesses would be objective and uncoached (AR at 336). This did not solve the Hearing Officer's problem—the Hearing Officer had an obligation to exclude irrelevant, immaterial, or unduly repetitious evidence, and to require agency employees to be made available to Plaintiff as witnesses at the hearing only if appropriate. See 7 C.F.R. § 11.8(c)(5)(ii). The Hearing Officer could not make the necessary determinations without a summary of the expected testimony to be elicited from Plaintiff's seventeen proposed witnesses.

Plaintiff had abundant notice of the witness restrictions and chose not to submit a summary of the expected testimony of his proposed witnesses. As a consequence, he was not permitted to call his witnesses to testify at the hearing. However, he was permitted to call as his own witness three of the four agency witnesses. The Hearing Officer's decision not to allow Plaintiff to call other witnesses was not a due process violation, particularly in light of the fact that Plaintiff was permitted to supplement the record after the hearing, and chose to submit verified written statements of only some of the persons he had identified as his seventeen proposed witnesses (Fred Whitney, "Bud" Santin, Frank Santin, Jr., John Santin, and Dale Lesiak) (AR at 267–84). If Plaintiff wanted testimony of his other proposed witnesses to be part of the record, he could have supplemented the record with notarized written statements from those witnesses. He chose not to. Plaintiff has made no showing that alleged irregularities in the hearing prejudiced him, and in fact stated at the hearing that he thought the hearing had been fair.[13] Plaintiff may not like the procedural rules governing appeal hearings before the NAD, but the actions by the Hearing Officer regarding Plaintiff's proposed witnesses did not violate due process.

### 3. Hearing Before NAD

Plaintiff has alleged several improprieties in the hearing before NAD. I will briefly address those allegations to explain my finding that Plaintiff has not proven any improprieties, and that there were no due process violations in the conduct of the hearing.

*Reliance on Allegedly False Statement*

A July 11, 1997 letter from Gerald Jasmer (state wildlife biologist with the NRCS) to Darlene Wyrick of FSA was submitted by the agency to supplement the record of the NAD hearing (AR. at 25). Plaintiff asserts that a sentence in Jasmer's letter [14] mischaracterized the written

---

**13.** At the end of the hearing, Plaintiff was asked by the Hearing Officer if he felt he had been able to present the information he needed to give. In response, Plaintiff stated "Yes, in fact I think you've been very fair in this hearing." (TR. at 140:14–15.) As the hearing was closing, Plaintiff was asked if he had other questions and he stated in response: "Just I want to say one thing. I thing you did a very good job in handling the hearing." (TR. at 147:4–5.)

**14.** "Mr. Prokop's assertion that the area was 'formerly non-wetland' is not correct according to our information and was even born [sic] out in one of the witness letters that the area was 'always wet.' " (AR. at 25)

statement of "Bud" Santin (submitted by Plaintiff to supplement the record (AR. at 276–77 and 281)), and asserts that since the NAD wrongly refused to allow Mr. Santin to testify, "Mr. Jasmer's statement could not be identified as a blatant lie. . . ." (P.'s Sept. 14, 1999 Br. (Rev.Copy) at 12.) I have already explained that the NAD Hearing Officer's decision not to allow Plaintiff's proposed witnesses to testify did not violate due process. That leaves Plaintiff's allegation that Jasmer's statement was false, and that reliance by the NAD Hearing Officer and NAD Director on this false statement violated due process.

"Bud" Santin's written statement provides as follows:

I have custom farmed Robert Prokop's 130 acres on which the Wetlands Determination has been made.[sic] for 20 years. The Southeast corner which contains a dry creek channel which courses through the property, *has always been wet and difficult to farm* because of standing water after drainage from Fred Whitney's farm which drains the Northern Sections of land toward to [sic] Loup River and enters Prokop's' property through a large culvert under the gravel road. *The serious difficulty in farming this area started about ten years ago.*

. . . [discussion of the beaver dam in the canal and resulting problems]

. . . The cattails and other vegetation on the bank started about ten years ago when the beavers had dammed the canal on Frank Santin's property. . . .

Since Robert Prokop dredged out the river creek channel, the wetness problem that was present in the farming operation has markedly decreased. . . .

With adequate drainage, there would be no water standing in the dry creek bed and the wet saturated soil that has been a problem in the immediate area of the dry creek bed would be dried up allowing easier farming processes and operation.

(AR. at 267–77) (emphasis added). Plaintiff asserts that the "always wet and difficult to farm" statement is totally qualified by the statement that "[t]he serious difficulty in farming this area started about ten years ago." In other words, Plaintiff asserts that the two highlighted phrases mean that the area became wet and difficult to farm only 10 years ago, when the beaver activity started. However, it is equally plausible to conclude that in fact the area has "always" been wet, but that the wetness was not a serious problem until compounded by the beaver activity. Other parts of the record support the latter interpretation—that used by Jasmer in his letter. *See, e.g.,* AR. at 267, 269, 276 (Site A is natural drainage way carrying precipitation and snow melt), 209, 215 (Site A and Site B both have hydric soil); TR. at 91–93 (intermittent stream and natural wetland have existed on Site B since at least the 1960s). In summary, Jasmer's statement was not false. Reliance upon this statement by the NAD Hearing Officer and Director did not constitute a due process violation.

### Alleged Improper Influence by State FSA Director

Plaintiff asserts that Bowen, the State FSA Director, improperly influenced appeals of the wetlands determination. This assertion is apparently connected to Plaintiff's misunderstanding of the process used by the Hearing Officer to determine whether proposed witnesses at the hearing have relevant information not available from other sources that is not unduly repetitious, and whether it is appropriate for agency employees to be made available to Plaintiff as witnesses at the hearing. The assertion that Bowen improperly influenced appeals of the wetlands determination is without merit.

In response to the notice of the NAD hearing mailed May 21, 1997 (AR. at 351–54) Plaintiff submitted a letter dated May 22, 1997 listing a total of seventeen witnesses he proposed to call (AR. at 350),

despite the fact that in a prehearing telephone conference call he had identified only four potential witnesses. Plaintiff's May 22 letter did not summarize the expected testimony of these seventeen proposed witnesses. Plaintiff's letter was sent to Mark Bowen, the State Executive Director of the FSA. Bowen notified Plaintiff by June 4, 1997 letter that the agency did not think seventeen witnesses were necessary (AR. at 349). Bowen's letter to Plaintiff noted that the state NRCS office had identified four agency employees who would be witnesses for the agency (Rasmussen, Jasmer, Gilg, and Huntwork) and that the agency would not object if its witnesses also testified for Plaintiff. (Plaintiff's May 22 letter listed eight current or former agency employees as potential witnesses, including Rasmussen, Jasmer, and Gilg.)

Regulations governing NAD hearings provide that during the time between the filing of an appeal and the issuance of a final determination by the NAD, no "officer or employee of the Division [shall] engage in *ex parte* communications regarding the merits of the appeal with any person having any interest in the appeal pending before the Division, including any person in an advocacy or investigative capacity." 7 C.F.R. § 11.7(a)(1). The regulations further provide that this prohibition does not apply to "[d]iscussions of procedural matters related to an appeal." *Id.* § 11.7(a)(1)(i). This ban on ex parte communication does not apply to the NAD's determination to give Bowen a copy of Plaintiff's May 22 letter listing potential witnesses, as discussion of witnesses under these circumstances was a discussion of procedural matters related to an appeal. This is particularly true in light of the fact that the Hearing Officer of the NAD may issue a subpoena for a witness only if the party proposing to call the witness

> has established that either a representative of the Department or a private individual possesses information that is pertinent and necessary for disclosure of all relevant facts which could impact the

final determination, that the information cannot be obtained except through testimony of the person, and that the testimony cannot be obtained absent issuance of a subpoena.

7 C.F.R. § 11.8(a)(2)(iii)(B). Furthermore, whether or not the testimony can be obtained without a subpoena, "the Hearing Officer may confine the presentation of facts and evidence to pertinent matters and exclude irrelevant, immaterial, or unduly repetitive evidence, information, or questions.... When appropriate, agency witnesses requested by the appellant will be made available at the hearing." *Id.* § 11.8(c)(4)(ii). The decision to exclude Plaintiff's proposed witnesses was made by the Hearing Officer, albeit after input from Bowen.

### Hearing Officer's Failure to Provide Pretrial Transcript

Plaintiff asserts that "[i]n a portion of the manuel [sic] not included in the Administrative Record, there is a provision that the Hearing Officer will provide the Plaintiff/Appellant a pre-trial transcript before continuing his determination." P.'s Pretrial Br. at 10. Plaintiff does not provide a copy of or a specific citation to this alleged requirement, and the proceeding before the NAD Hearing Officer is an appeal of an agency decision and not a trial, so it is difficult to determine what Plaintiff refers to. The regulations do provide that "[t]he Director, the Hearing Officer, and the appellant shall have access to the agency record of any adverse decision appealed to the Division for a hearing. *Upon request,* the agency shall provide the appellant a copy of the agency record." 7 C.F.R. § 11.8(a)(1) (emphasis added). However, Plaintiff has provided no evidence to indicate that he requested and was not provided a copy of the agency record.

### Field Visits Were Shams Because Agency Employees Did Not Carry Agency Manual, Rules and Regulations With Them on Visit

Plaintiff asserts that all investigative teams on field visit must carry the agency

manuals, rules and regulations with them on the field visit. He alleges that the agency employees making field visits to his farm did not carry this material with them, and the fact that they did not indicates that the field visits were shams, intended to provide documentation of the agency's predetermined conclusion that the sites in question were wetland. Plaintiff cites no law in support of this assertion, and it is without merit.

### Incompleteness of Agency record

Plaintiff asserts that the agency record is incomplete, arguing that several necessary letters and other information he deems material are not in the record. Plaintiff mischaracterizes the nature of this judicial review of the final agency decision. This court's sole task is to determine whether the existing record supports the determination of the agency. If it does, then it is irrelevant that Plaintiff wishes that additional data was in the record. If Plaintiff considered the NAD hearing record to be incomplete, he should have supplemented the record by providing any missing information when the Hearing Officer gave him the opportunity to supplement the record. Since he did not, Plaintiff's only other recourse is to argue that the existing record cannot support the final agency decision. Plaintiff has lost that argument.

### D. DAMAGES

Plaintiff's Pre–Trial Brief continues to assert his request for an award of consequential damages resulting from the agency's action. Jurisdiction in this case is based on 28 U.S.C. § 1346 and the Administrative Procedures Act, 5 U.S.C. §§ 701, *et seq.* (Filing 1, Complaint ¶ 3). However, this court is without jurisdiction to award damages in this case.

■ Absent a waiver of sovereign immunity, this court is without jurisdiction to award monetary relief against the United States. *McBride v. Coleman*, 955 F.2d 571, 576 (8th Cir.1992), *cert. denied*, 506

U.S. 819, 113 S.Ct. 65, 121 L.Ed.2d 32 (1992). *See also United States v. Mitchell*, 463 U.S. 206, 212, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). There is no waiver of sovereign immunity in 28 U.S.C. § 1346, and 5 U.S.C. § 702 expressly limits review under the Administrative Procedures Act to actions "seeking relief other than money damages."

■ A party may obtain monetary relief under the APA only where the judgment represents benefits or payments withheld as part of the agency determination, rather than consequential damages resulting from the agency action. *Bowen v. Massachusetts*, 487 U.S. 879, 893, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988) (federal agency administered medicaid grant program and state sought payment by federal agency of grant moneys it had been deprived of rather than monetary compensation for a wrong suffered; money damages limitation in § 702 did not bar the state's suit because the state sought declaratory and injunctive relief and the monetary aspects of the relief sought were not "money damages" within the meaning of § 702). *See also, Maryland Dep't. of Human Resources v. Department of Health and Human Serv.*, 763 F.2d 1441, 1446 (D.C.Cir. 1985); *Esch v. Yeutter*, 876 F.2d 976, 981 (D.C.Cir.1989).

In this case, the agency determination did not result in the withholding of any program payments due to Plaintiff. This case began when Plaintiff sought permission to clean out a canal on property abutting Plaintiff's farm, and the agency granted Plaintiff permission to clean out the canal. This court is without jurisdiction to award consequential money damages in this action.

### III. CONCLUSION

The case before this court is the sixth review of the determination that Sites A and B are wetlands subject to Swampbuster restrictions. In the course of this review and appeal process, there were two separate field visits by agency employees (with different agency employees on each

visit). Plaintiff has exhausted all administrative remedies by appealing the determination through all agency channels. He has received the full measure of due process to which he was entitled and has been granted permission to take the action affecting his property which he sought to take—he has received permission to clean out the canal on his neighbor's property despite the fact that this action would affect the "farmed wetland pasture" identified on Plaintiff's land. The agency has even invited Plaintiff to request another determination if Sites A and B dry up significantly after regular maintenance of the canal. I find that there has been no abuse of discretion by the NAD director in upholding the determination that Sites A and B are farmed wetland pasture within the meaning of 16 U.S.C. §§ 3821–23.

IT IS ORDERED that the determination that the land is farmed wetland pasture is affirmed. Judgment for Defendant will be entered by separate order.

## JUDGMENT

Pursuant to the court's Memorandum and Order issued this date, judgment is entered for the Defendant and against the Plaintiff, providing that the Plaintiff shall take nothing and this case is dismissed with prejudice.